IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| JEREMY NATHANIEL WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 119-165 |
| | ) | |
| LATASHA HARRIS and | ) | |
| JASON SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

Plaintiff, incarcerated at Augusta State Medical Prison ("ASMP") in Grovetown, Georgia, is proceeding *pro se* and *in forma pauperis* ("IFP") in this case filed pursuant to 42 U.S.C. § 1983.  Before the Court are the parties' cross-motions for summary judgment.  For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Plaintiff's motions to add evidence be **GRANTED**, (doc nos. 40, 48, 61),  Plaintiff's motion to dismiss his first motion for summary judgment be **GRANTED**, (doc. no. 60), Plaintiff's first motion for summary judgment be **DENIED AS MOOT**, (doc. no. 39), Plaintiff's second motion for summary judgment be **DENIED**, (doc. no. 58), Defendants' motion for summary judgment be **GRANTED**, (doc. no. 53), a final judgment be entered in favor of Defendants, and this civil action be **CLOSED**.

## I.  PROCEDURAL BACKGROUND

On April 30, 2020, the Court screened Plaintiff's amended complaint and allowed to proceed Plaintiff's Eighth Amendment excessive force and conditions of confinement claims against Defendants Harris and Smith.  (Doc. no. 44.)  Before the Court are the parties' cross motions for summary judgment.  (Doc. nos. 53, 58.)  Because Plaintiff did not provide a statement of material facts directly refuting Defendants' statement, the Court deems admitted all portions of Defendants' statement having evidentiary support in, and not otherwise contradicted by, the record and which are not properly opposed by Plaintiff as contemplated under Federal Rule of Civil Procedure 56.[1]  See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (per curiam) (finding no error in deeming defendants' material facts admitted where pro se prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (same).  Defendants continue to shoulder the burden of demonstrating the absence of any genuine issue of material fact, and the Court will review the entire record "to determine if there is, indeed, no genuine issue of material fact."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).

## II.  FACTUAL BACKGROUND

The events giving rise to this lawsuit occurred while Plaintiff was housed in ASMP Unit 3B during the period of October 1, 2018 to November 6, 2018.  (Harris Aff., ¶ 4.)  At that time, Defendant Harris was Unit Manager over the Nursing Unit and I.D. Unit,

---

[1]Federal Rule of Civil Procedure 56 requires a party disputing a fact to cite "to particular parts of materials in the record," and an affidavit or declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1) & (4).

Defendant Smith was a Correctional Emergency Response Team ("CERT") officer, and Ms. Colon was Chief Counselor in charge of the grievance system at ASMP.  (Id.; Smith Aff., ¶ 2; Colon Aff., ¶ 4.)   The claims asserted by Plaintiff involve two related but distinct occurrences, the first concerning use of pepper spray on Plaintiff and the second concerning the alleged deprivation of running water and a mattress.

## A. Pepper Spraying Incident

Most of the salient facts are undisputed.  On October 2, 2018, one day after his arrival at Unit 3B of the Crisis Stabilization Unit ("CSU"), officers moved Plaintiff into cell six, a one-man cell with a steel door, flap, and glass front wall.  (Harris Aff., ¶ 4; doc. no. 61, p. 2.) On that same day, Plaintiff intentionally flooded cell six, causing water to spill into the hallway, and refused to cooperate with responding officers who asked him to place his hands through the flap for handcuff removal.  (Harris Aff., ¶ 5; Smith Aff., ¶ 7; doc. 48-1, p. 5; doc. no. 40-2; doc. no. 40-3.)  Defendant Harris explained removal of Plaintiff's handcuffs is an important safety requirement because inmates use handcuffs to shatter glass windows, strike officers, and choke officers.  (Harris Aff. ¶ 5.)

At approximately 2:45 P.M., an ASMP officer began video recording Plaintiff's interactions with officers, and the most critical events are captured on this recording.  (Harris Aff., ¶ 6; Harris Aff., Ex. A.)  Defendant Smith and other officers asked Plaintiff to cooperate with handcuff removal and stated this was Plaintiff's final warning.  (Harris Aff., Ex. A., 01:11-02:47.)   Plaintiff approached the flap, and Defendant Harris announced Plaintiff's compliance with instructions to do so.  (Id.)  ASMP officers instructed Plaintiff to bend down and place his hands through the flap.  (Id.)  Plaintiff did not bend down and remained with his back to the door.  (Id.)  After one minute of Plaintiff refusing to bend

down, Defendant Harris ordered the pepper-spraying of Plaintiff's cell but no spraying occurred yet. (Id., 02:48.)

Defendant Smith, with other CERT officers, approached Plaintiff's cell and again ordered Plaintiff to place his hands through the flap for handcuff removal. (Id., 03:58.) After several refusals by Plaintiff to comply, Officer Smith and the CERT officers walked away from the cell. (Id.) Plaintiff reached inside of his mouth several times with pinched fingers, and then used the same pinched fingers to scratch the front glass of his cell. (Id., 04:28.) Defendant Harris observed the glass scratching and announced Plaintiff had a razor blade and was refusing to give up the blade. (Id.) Defendant Smith and two other CERT officers approached Plaintiff's cell with Oleoresin Capsicum ("OC") spray. (Id., 04:45.) Defendant Smith and another CERT officer ordered Plaintiff to place his handcuffs through the flap to avoid being sprayed. (Id.) Plaintiff, with his back turned, squatted against the cell door such that his legs were directly in front of the flap of the cell door. (Id.) Defendant Smith sprayed OC horizontally through the flap for approximately six seconds. (Id. 05:22-05:28.) Defendant Smith and another CERT team officer closed and locked the flap of Plaintiff's cell, allowing the OC to fill the cell. (Id., 05:30.)

Over the next minute, the OC spray filled Plaintiff's cell as Plaintiff moved to his knees and banged against his cell door. (Id., 05:31-07:11.) Defendant Smith and other CERT team officers approached Plaintiff's cell. (Id., 7:12.) Defendant Smith opened the tray flap and instructed Plaintiff to hand over the razor blade. (Id.) Plaintiff's response is mostly inaudible; however, it appears Plaintiff responded, "it's under the door." (Id.; Smith Aff., ¶ 10.) The CERT team officers pulled blankets away from the base of Plaintiff's cell to search for the blade. (Harris Aff., Ex. A.) CERT officers opened Plaintiff's door and

4

checked Plaintiff's hands for the alleged razor blade, but no blade is shown or found.  (Id., 08:03.)

CERT officers picked Plaintiff off the floor and escorted him to the medical department.  (Id., 8:04-9:35; Harris Aff., Ex. B., 00:00-11:02.)  While waiting for a medical exam room and a physician's assistant ("PA"), Plaintiff showed signs of unrest and agitation from the OC spray.  (Harris Aff., Ex. B, 01:50-10:37.)  The CERT officers escorted Plaintiff into the medical exam room.  (Id., 11:03.)  Following the instructions of PA Sims, the CERT officers turned on a water station to spray Plaintiff's face, which occurred approximately fifteen minutes after the initial OC spray into Plaintiff's cell.  (Id., 11:11.)  PA Sims performed an assessment and found Plaintiff was alert and responsive with a high respiratory rate, high heart rate, elevated blood pressure, and Rhinorrhea and redness to the face and neck.  (Id., 11:11-16:52; Sims Aff., Ex. A.)  After the assessment, CERT officers escorted Plaintiff back to the CSU and placed him in the shower, about twenty-four minutes after the initial OC spray.  (Harris Aff., Ex. B, 16:53-20:34.)  The second video recording ends with Plaintiff's entry into the shower.

While the video recordings clearly establish the facts set forth above, there are several glosses by Plaintiff, beginning with his assertion Defendant Harris threatened him by stating she would "teach your ass" just before the video recording began.  (Doc. 28-1, p.1.)  Plaintiff also avers he never actually possessed a razor blade, but instead merely pretended to have one.  (Harris Aff., Ex. A, 04:18.)  Defendants deny the threat accusation, and they aver Plaintiff pulled an actual razor blade out of his mouth and the presence of such a blade required immediate use of OC spray.  (Harris Aff., ¶ 13; Harris Aff., Ex. A; Smith Aff., ¶ 8.)

A helpful point of reference in considering the OC spraying of Plaintiff's cell is Georgia Department of Corrections ("GDC") Standard Operating Procedure ("SOP") number 103.07, effective September 1, 2014, which establishes guidelines concerning use of force. (Doc. no. 40-4, § I.)  Agents may use non-deadly force to protect themselves or another from physical harm, restrain or subdue a resistant subject, or bring an unlawful situation under control.  (Id. § IV(C).)  Agents who complete training may use OC spray when a subject has signaled his intention to resist lawful restraint by: (1) attempting to commit a violent injury; (2) committing an act reasonably construed as a threat of immediate and violent injury; (3) threatening a fight or resistance to arrest where there is a reasonable belief the threat will be carried out; (4) fleeing despite notification of being under arrest; and (5) resisting restraint or arrest by pulling away or refusing to submit to control in a manner constituting enhanced physical or mechanical defiance.  (Id. § IV(E)(2)(A)(1).)  Whenever practical and reasonable, agents issue a verbal warning prior to use of OC spray.  (Id. § IV(E)(2)(A)(2).)  When warranted, agents administer a single spray burst for one to three seconds directed at the subject's eyes, nose, and mouth, and additional bursts may be used if the initial burst proves ineffective.  (Id. § IV(F)(1).)  Immediately after spraying, agents must be on alert for any indication of the need for medical care and immediately summon emergency medical aid if necessary.  (Id. § IV(F)(2)(C).)

## B.  Running Water and Mattress

Plaintiff alleges Defendants deprived him of running water and a mattress for an entire month following the October 2, 2018 incident.  (Doc. no. 58, pp. 2-3.)  Defendant Harris concedes she ordered the flow of water in Plaintiff's cell reduced after the flooding incident, but claims the reduction served the sole purpose of preventing Plaintiff from

flooding his cell again.  (Harris Aff., ¶ 19.)  According to Defendant Harris, the water was never turned off completely, and Plaintiff always had enough running water for basic hygiene.  (Id.)

The October 2, 2018 video recording shows a maintenance worker attempting to turn off the water in Plaintiff's cell to prevent further flooding.  (Harris Aff., Ex. A, 00:59.)  The CSU logbooks reflect the following.  After the October 2nd incident, maintenance entered cell six to turn off the water.  (doc. no. 48-1, p. 5.)  On October 4, 2018, Plaintiff asked for a cup of water, which Plaintiff asserts he needed due to no running water in his cell.  (Doc. no. 58, p. 7; doc. no. 60, p. 4.)  Officers placed sandbags in front of Plaintiff's cell door to prevent Plaintiff from throwing feces or urine, which Plaintiff avers he did because of being deprived of running water to drink and flush his toilet.  (Id.)

With respect to the mattress, on October 13, 2018, Plaintiff attempted to hang himself several times with a string near the front of his cell and fell back on his mattress during these attempts.  (Alston Aff., ¶ 9; Alston Aff., Ex. F.)  The ASMP nurse informed her supervisor, and the supervisor ordered the removal of Plaintiff's mattress, jumpsuit, glasses, and watch. (Id.)  While Defendant Harris does not recall directing staff to remove Plaintiff's mattress, she would have done so only to comply with orders from the mental health staff and otherwise does not have authority to remove a mattress from a cell.  (Id., ¶ 20.)

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The mere existence of some factual dispute will not defeat summary judgment unless

that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*).  On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

8

**B.      Plaintiff's Motion for Summary Judgment**

Plaintiff's motion for summary judgment should be denied for three reasons.  First, in contravention of Local Rule 56.1, Plaintiff did not provide a statement of undisputed material facts, and a motion may be summarily denied for failure to comply with the Court's Local Rules.  See Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979). Second, Plaintiff contends there is "a genuine issue in material facts," and argues he "has shown more than [enough] evidence to support all his claims against Defendant Harris and Smith which [relief] should be granted on the Plaintiff['s] behalf."  (Doc. no. 58, p. 20.)  Of course, to prevail at summary judgment, Plaintiff must do more than provide adequate support for a claim, he must show "on all the essential elements of [his] case . . . , no reasonable jury could find for" Defendants.  Four Parcels of Real Prop., 941 F.2d at 1438. Plaintiff has failed to make such a showing.  Finally, as explained below, Defendants are entitled to summary judgment, which by necessity means Plaintiff's summary judgment motion on the same claims should be denied.

**C.      Defendants' Motion for Summary Judgment**

Defendants contend they are entitled to summary judgment because they did not violate Plaintiff's Eighth Amendment rights during the OC spraying encounter, they are entitled to qualified immunity even if a violation occurred, and Plaintiff failed to exhaust his administrative remedies with respect to the claim for deprivation of a mattress and running water.  (Doc. no. 53-1, pp. 20-21, 24, 25.)  Plaintiff, in his amended complaint, contends the exhaustion requirement should not apply to him because he did not have access to grievance documents.  (Doc. no. 28-1, p. 3.)  The Court finds Defendants are entitled to summary judgment because no Eighth Amendment violation occurred during the OC spraying

9

encounter, and Plaintiff failed to exhaust administrative remedies with respect to the alleged deprivation of a mattress and running water.  These findings moot the qualified immunity defense.

>  **1.    Defendants Are Entitled to Summary Judgment on the Merits of Plaintiff's Eighth Amendment Excessive Force Claim**

> **a.    Overview of Excessive Force Legal Landscape**

"The Eighth Amendment's proscription of cruel and unusual punishments also governs prison officials' use of force against convicted inmates." <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1374 (11th Cir. 1999).  To prevail on an excessive force claim, Plaintiff must satisfy both an objective and subjective component. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

Objectively, Plaintiff must show that he suffered a "sufficiently serious" deprivation harmful enough to establish a constitutional violation. <u>Id.</u>  *De minimis* uses of physical force are beyond constitutional recognition, provided that the use of force is not of a sort "repugnant to the conscience of mankind." <u>Hudson v. McMillian</u>, 503 U.S. 1, 9-10 (1992).  Accordingly, not "every malevolent touch by a prison guard gives rise to a federal cause of action," even if it "may later seem unnecessary in the peace of a judge's chambers . . . ." <u>Id.</u> at 9 (citation omitted).  However, because injury and force are imperfectly correlated and it is the force used that counts, an inmate "who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 38 (2010).

Subjectively, Plaintiff must show the actions taken involved the unnecessary and wanton infliction of pain. <u>See</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986).  That is,

> [F]orce does not violate the Eighth Amendment merely because it is
> unreasonable or unnecessary:  "The infliction of pain in the course of a prison
> security measure . . . does not amount to cruel and unusual punishment simply
> because it may appear in retrospect that the degree of force authorized or
> applied for security purposes was unreasonable, and hence unnecessary in the
> strict sense."

Campbell, 169 F.3d at 1374 (quoting Whitley, 475 U.S. at 319).  Rather, the Court must

consider "'whether force was applied in a good-faith effort to maintain or restore discipline,

or maliciously and sadistically to cause harm.'"  Harris v. Chapman, 97 F.3d 499, 505 (11th

Cir. 1996) (quoting Hudson, 503 U.S. at 7).

The subjective component analysis narrows the precise inquiry applicable at the

summary judgment stage as follows:

> [C]ourts must determine whether the evidence goes beyond a mere dispute
> over the reasonableness of a particular use of force or the existence of
> arguably superior alternatives.  Unless it appears that the evidence, viewed in
> the light most favorable to the plaintiff, will support *a reliable inference of
> wantonness in the infliction of pain* under the standard we have described, the
> case should not go to the jury.

Campbell, 169 F.3d at 1375 (quoting Whitley, 475 U.S. at 322).

Because the subjective component is contextual, courts consider the following

factors:  (1) extent of injury, (2) need for application of force, (3) relationship between need

and amount of force used, (4) threat reasonably perceived by the responsible officials, and

(5) any efforts made to temper the severity of a forceful response.  Hudson, 503 U.S. at 7;

Campbell, 169 F.3d at 1375.  Any action taken should be viewed in light of the wide-ranging

deference accorded prison officials acting to preserve discipline and institutional security.

Hudson, 503 U.S. at 6; Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (*per

curiam*).  For example, use of an appropriate degree of force to compel compliance with a

valid order is justified.  Brown v. Smith, 813 F.2d 1187, 1189 (11th Cir. 1987); see also Ort

v. White, 813 F.2d 318, 325 (11th Cir. 1987) (evaluating excessive force claim requires consideration of whether immediate coercive measures were taken "in a good faith effort to restore order or prevent a disturbance, and if the force used was reasonable in relation to the threat of harm or disorder apparent at the time").

> **b.**    **The Evidence Does Not Support a Reliable Inference of Wantonness in the Infliction of Pain When Viewed in a Light Most Favorable to Plaintiff**

In his motion for summary judgment, Plaintiff maintains Defendants' use of OC spray was malicious and unnecessary because he posed no danger, and less forceful methods were available to accomplish Defendants' goals.  Defendants aver Plaintiff was noncompliant and posed a danger to himself and others because he was armed with a razor blade and handcuffs. Viewing the facts in the light most favorable to Plaintiff, Defendants are entitled to summary judgment because the record does not support a reliable inference of wantonness in the infliction of pain, and no reasonable juror could find Defendants applied force maliciously and sadistically to cause harm.

Of the five Hudson factors in the subjective analysis, the only factor at all favorable to Plaintiff under his version of events is the first one concerning extent of injury.  While Plaintiff concedes he suffered no physical injury, he contends psychological injuries in the form of increased self-harm attempts and related admissions to the CSU.  (Doc. no. 58, p. 15.) Lasting psychological injuries are "sufficiently serious injuries to satisfy the harm requirement."  See Thomas v. Bryant, 614 F.3d 1288, 1313 (11th Cir. 2010).  While the record evidence of Plaintiff's alleged psychological injuries is sparse, the Court will credit his allegations fully for purposes of the present motion.  However, all four of the remaining Hudson factors weigh heavily in favor of Defendants.

The Court will turn next to the fourth <u>Hudson</u> factor, i.e. the threat reasonably perceived by responding officials.  Defendants contend Plaintiff possessed a razor blade while Plaintiff contends he merely pretended to possess one.  The objective video evidence shows Plaintiff (1) refused to comply with repeated demands to present his hands in the flap for uncuffing; (2) reached into his mouth with his right hand while pinching his fingers and moving his mouth in a manner reasonably perceived as an effort to remove an object from his mouth; and (3) moving the same hand, with fingers still pinched, out of his mouth and to the cell window, where Plaintiff made an audible scratching noise with the same hand.  (<u>Id.</u> at 04:18.)  Even if Plaintiff never actually possessed a razor blade, the video evidence shows his pretend act was sufficiently convincing to establish Defendants' reasonable perception.  The threat reasonably perceived by Defendants, therefore, was an inmate with a history of suicidal tendencies who was armed with a razor blade that he pulled from his mouth and used to scratch the cell window while refusing Defendants' repeated commands to present his hands for uncuffing.  No reasonable juror could find otherwise.

Having established the threat reasonably perceived, the three remaining factors fall easily into place.  Any reasonable juror would conclude a need for force existed in these circumstances, Defendants' use of OC spray was reasonably related to the threat reasonably perceived, and Defendants made reasonable efforts to temper the severity of a forceful response.  Such as Defendants spraying the inside of Plaintiff's cell, not Plaintiff directly, in an effort to disable Plaintiff and avoid a forceful entry and physical struggle.  This approach minimized the danger for everyone significantly, including Plaintiff, and was indisputably necessary because of the concern Plaintiff possessed a razor blade.  No reasonable juror could disagree with any of these findings.

Further, the undisputed facts show Defendants acted in compliance with GDC guidelines. Plaintiff posed a threat of injury to himself or others. Defendants provided Plaintiff adequate opportunities to comply and warned Plaintiff about the use of OC spray should he not comply. Finally, Defendants limited the OC spray to a single spray. Although the spray lasted six seconds as opposed to the recommended three, Defendants did not aim the spray directly at Plaintiff but rather minimized the impact by spraying around him.

Importantly, the Eleventh Circuit has recognized that usage of caustic sprays is a reasonable method to avoid a potentially dangerous physical confrontation, particularly when the spray is of a short duration, in that case approximately five seconds, and the recipient is provided adequate decontamination. See Danley v. Allen, 540 F.3d 1298, 1307-08 (11th Cir. 2008), *overruled on other grounds as recognized in* Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010); Burke v. Bowns, 653 F. App'x 683, 696 (11th Cir. 2016). Prison officials "need not wait until disturbances reach dangerous proportions before responding." Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990). Here, it is undisputed the spray was of short duration, and CERT officers took Plaintiff, directly and without delay, from his cell to the ASMP medical unit for evaluation and escorted him from there to the showers to rinse off the remaining OC spray.

For the reasons stated above, the evidence, when viewed in the light most favorable to Plaintiff, does not "go beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." Campbell, 169 F.3d at 1375 (quoting Whitley, 475 U.S. at 322). Nor does it "support a reliable inference of wantonness in the infliction of pain . . . ." Id. Because Plaintiff cannot satisfy the subjective component of an Eighth Amendment excessive force claim, summary judgment should be granted to

14

Defendants.  See  Burke v. Bowns, 653 F. App'x at 696 (holding no reasonable jury could find short pepper spray of non-compliant inmate malicious and sadistic);  Thompson v. Carani, No. 1:06-CV-099, 2008 WL 5088541 (S.D. Ga 2008) (finding use of pepper spray on non-complaint inmate did not satisfy subjective component).

### 2. Plaintiff Failed to Exhaust Administrative Remedies Prior to Filing His Eighth Amendment Conditions of Confinement Claim Concerning Deprivation of a Mattress and Running Water

#### a. The Legal Framework for Determining Exhaustion

Although the failure to exhaust administrative remedies is an affirmative defense typically raised in a motion to dismiss, it may also be raised in a motion for summary judgment.  See Bryant v. Rich, 530 F.3d 1368, 1374-75 (11th Cir. 2008).  When raised in a motion for summary judgment, the Court should treat the exhaustion issue as if it were raised in a motion to dismiss, and the analysis does not result in an adjudication on the merits.  See id. The Eleventh Circuit has laid out a two-step process for motions to dismiss and summary judgment motions raising the exhaustion defense.  First, the court looks to the factual allegations made by both parties, taking the plaintiff's version as true where they conflict, and if in that light the complaint is subject to dismissal for failure to exhaust administrative remedies, the defendants' motion will be granted.  See Turner v. Burnside, 541 F.3d 1077, 1082-83 (11th Cir. 2008) (citing Bryant, 530 F.3d at 1373-74).  If the complaint is not subject to dismissal at the first step, then at step two the court makes specific findings to resolve the disputed factual issues, with the defendant bearing the burden of proving Plaintiff has failed to exhaust his administrative remedies.  Id.  Based on its findings as to the disputed factual issues, the court determines whether the prisoner has exhausted his available administrative remedies. Id.  Because exhaustion "is treated as a matter of abatement and not an adjudication on the

merits, it is proper for a judge to consider facts outside the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." Bryant, 530 F.3d at 1376 (citations omitted).

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because exhaustion of administrative remedies is a "precondition" to filing an action in federal court, the Eleventh Circuit requires prisoners to complete the administrative process *before* initiating suit. Poole v. Rich, 312 F. App'x 165, 166 (11th Cir. 2008) (*per curiam*); see also Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000). "The filing of a civil suit without properly exhausting all available administrative remedies is a procedural misstep that is fatal to the underlying case." McKeithen v. Jackson, 606 F. App'x 937, 939 (11th Cir. 2015) (*per curiam*) (citing Johnson v. Meadows, 418 F.3d 1152, 1158-59 (11th Cir. 2005)).

The PLRA's mandatory exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." Porter v. Nussle, 534 U.S. 516, 520 (2002). Moreover, the Court does not have discretion to waive the requirement, even if it can be shown that the grievance process is futile or inadequate. See Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012) (*per curiam*) (citing Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998)). Under the PLRA, the Court has no discretion to inquire into whether administrative remedies are "plain, speedy, [or] effective." Porter, 534 U.S. at 524; see also Alexander, 159 F.3d at 1326. Rather, under the PLRA's "strict exhaustion" requirement,

administrative remedies are deemed "available" whenever "'there is the possibility of at least some kind of relief.'"  Johnson, 418 F.3d at 1155, 1156.

Furthermore, the PLRA also "requires proper exhaustion."  Woodford v. Ngo, 548 U.S. 81, 93 (2006).  In order to properly exhaust his claims, a prisoner must "us[e] all steps" in the administrative process; he must also comply with any administrative "deadlines and other critical procedural rules" along the way.  Id. at 90 (internal quotation omitted).  If a prisoner fails to complete the administrative process or falls short of compliance with procedural rules governing prisoner grievances, he does not satisfy the exhaustion requirement.  Johnson, 418 F.3d at 1159.

### b.        The Administrative Grievance Procedure

Upon admission to GDC, prisoners receive an oral summary of the grievance procedures and an outline in their Orientation Handbook, and prisoners may review the complete grievance procedures, as set forth in the GDC SOP, in the law library of each GDC facility. (Colon Aff., ¶¶ 6-7.)  Inmates may grieve "any condition, policy, procedure, or action or lack thereof that affects the offender personally," other than those specifically excluded by policy.  (Colon Aff., Ex. A, § IV(B)(1).)

The grievance procedure has two steps: (1) Original Grievance, and (2) Central Office Appeal.  (Id. § IV(C),(D).)  Original grievance forms are available in all living units and inmates in isolation and segregation areas are provided grievance forms upon request. (Colon Aff., ¶ 11.)  The administrative remedies procedure commences upon filing the Original Grievance with a counselor.  (Colon Aff., Ex. A, § IV(C)(1)(b-d).)  The inmate has ten calendar days from "the date the offender knew, or should have known, of the facts giving rise to the grievance" to file the grievance.   (Id.)   The counselor forwards the

grievance to the grievance coordinator, who must screen the grievance to determine whether to accept it for processing or recommend the Warden reject it.  (Id. § IV(C)(1)(e).)

The SOP requires the Warden give a response to the counselor to deliver to the inmate within forty calendar days of its original receipt; a onetime ten-calendar-day extension may be granted.  (Id. § IV(C)(1)(e).)  Once the offender receives the Warden's response, or if the time allowed for a response to the grievance has expired without action, the offender may proceed to step two of the grievance process, a Central Office Appeal.  (Id. § IV(C)(1)(g).)  The inmate has seven calendar days from the date he receives the response to the grievance to file a Central Office Appeal, but this time limit may be waived for good cause.  (Id. § IV(C)(2).)  The Commissioner or his designee then has 100 calendar days after receipt of the grievance appeal to deliver a decision to the offender.  (Id.)

### c.   Plaintiff's Failure to Exhaust

Plaintiff filed Grievance 276269 on October 15, 2018, alleging Defendants used unreasonable force during the pepper-spraying incident on October 2, 2018.  (Colon Aff., ¶ 22; Colon Aff., Ex. D.)  Plaintiff did not allege in Grievance 276269 that Defendant Harris deprived him of a mattress or running water, and Plaintiff filed no other grievances between October 2, 2018 and the filing of this case.  (Colon Aff., ¶ 23; Colon Aff., Ex. C; Colon Aff., Ex. D.)  Plaintiff avers he could not file a grievance concerning the mattress and running water because officials denied him access to pens and property while he was on CSU status.  (Doc. no. 28-1, p. 3.)  Plaintiff further contends he submitted such a complaint to staff for filing at an unspecified time after returning to a lockdown unit.  (Doc. no. 28-1, p. 3.)  Months after his submission, Plaintiff alleges he learned officials never filed this second complaint and he submitted a new complaint that was dismissed based on the ten-day limit.

(Id.)  Defendants contend Plaintiff always maintained access to the grievance filing system, either directly or upon request.  (Colon Aff., ¶ 11.)  Defendants further contend Plaintiff only filed his first grievance for excessive force, and no other grievances, before initiation of this suit.

The Court finds Plaintiff's contentions noncredible for the following reasons. First, Plaintiff claimed to not file a timely conditions of confinement grievance because his CSU status prevented Plaintiff access to materials.  However, Plaintiff did in fact file Grievance 276269 on October 15, 2018, while on CSU status.  (Colon Aff., para. 22; Colon Aff., Ex. "D".)  Additionally, even if Plaintiff were unable to file grievances while on CSU status, Plaintiff claims to have been denied a mattress and water for an entire month, and it is undisputed he was only on CSU status for five days during that one-month period.  (Alston Aff., ¶ 9; Alston Aff., Ex. "F".)

Second, Plaintiff contends he submitted a complaint to staff for filing at an unspecified time after returning to a lockdown unit concerning his mattress and lack of water.  (Doc. no. 28-1, p. 3.)  Months after his submission, Plaintiff alleges he learned officials never filed this complaint and he submitted a new complaint that was dismissed based on the ten-day limit.  (Id.)  However, records of Plaintiff's grievance filings show Plaintiff did not file a grievance subsequent to Grievance 276269 and before initiation of this suit, and furthermore he has never filed a grievance concerning deprivation of running water and a mattress.  (Colon Aff., Ex. C.)  Thus, the Court finds Plaintiff never filed a grievance related to denial of a mattress or water before initiating this suit, nor did Plaintiff have a proper excuse for not filing one.

The exhaustion requirement is not satisfied if a prisoner fails to complete the administrative process or falls short of compliance with procedural rules.  Johnson, 418 F.3d at 1159.   The Supreme Court has explained the rationale behind requiring "proper exhaustion" as follows:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.  The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.  A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction. . . .  For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time.  If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court.  And acceptance of the late grievance would not thwart the prisoner's wish to bypass the administrative process; the prisoner could easily achieve this by violating other procedural rules until the prison administration has no alternative but to dismiss the grievance on procedural grounds. We are confident that the PLRA did not create such a toothless scheme.

Woodford, 548 U.S. at 95; see also Johnson, 418 F.3d at 1159 (allowing an untimely grievance to satisfy exhaustion requirement would defeat aims of PLRA to review the merits of a prisoner's claim, does "not spur the corrective action that might have obviated the need for litigation, . . . filter  . . . potential frivolous claims, . . .[or] develop[] . . . an administrative record to assist the courts in deciding the controversy").

Because the record confirms Plaintiff did not exhaust his administrative remedies, his condition of confinement claims are subject to dismissal and Defendants are entitled to summary judgment.  See Leal v. Ga. Dep't of Corr., 254 F.3d 1276, 1279 (11th Cir. 2001) (per curiam) ("'[U]ntil such administrative remedies as are available are exhausted,' a prisoner is precluded from filing suit in federal court.") (citations omitted); Higginbottom, 223 F.3d at 1261.  Because the motion for summary judgment should be granted based on

Plaintiff's failure to exhaust, the Court need not address Defendants' remaining arguments as to Plaintiff's condition of confinement claims.  (See doc. no. 53-1, p. 20.)

### 3.      Qualified Immunity and Damages under the PLRA

The Court need not address Defendants' qualified immunity and damages arguments because Defendants are entitled to summary judgment on the merits of Plaintiff's excessive force claim, and the claim for deprivation of water and a mattress is subject to dismissal for failure to exhaust.

## IV.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Plaintiff's motions to add evidence be **GRANTED**, (doc nos. 40, 48, 61), Plaintiff's motion to dismiss his first motion for summary judgment **GRANTED**, (doc. no. 60), Plaintiff's first motion for summary judgment be **DENIED AS MOOT**, (doc. no. 39), Plaintiff's second motion for summary judgment be **DENIED**, (doc. no. 58), Defendants' motion for summary judgment be **GRANTED**, (doc. no. 53), a final judgment be entered in favor of Defendants, and this civil action be **CLOSED**.

SO REPORTED and RECOMENEDED this 10th day of December, 2020, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA